UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PATRICIA BRANNAN and ALYSSA SANDERS, individually and as heirs of NATALIE SANDERS, | § § § | |
| | § | |
| *Plaintiffs,* | § § | |
| | § | Civil Action No. 3:19-CV-1263-X |
| v. | § § | |
| CITY OF MESQUITE, TEXAS, et al., | § § | |
| *Defendants.* | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from the death of Natalie Sanders, who died as a result of a methamphetamine overdose while in custody at the Mesquite jail. The defendant officers and paramedics moved to dismiss for failure to state a claim and asserted qualified immunity. [Doc. No. 46]. The City of Mesquite separately moved to dismiss for failure to state a claim. [Doc. No. 44]. After careful consideration, and as explained below, the Court **GRANTS** Mesquite's motion to dismiss and **GRANTS** the individual defendants' motion to dismiss as to Paramedic Victor Palasciano, Paramedic Kyle Stone, Officer Peter Velasquez, Officer Sherry Green, and Officer Marcelet Martin. The Court **DENIES** the individual defendants' motion to dismiss with respect to Officer Layton Winters and Lieutenant Michael Kelly.

1

I. Background

In 2017, Officers Wood and Winters arrested Natalie Sanders on an outstanding warrant.  Sanders surrendered a methamphetamine pipe to the officers. After being placed in the patrol car, Sanders put an object—believed to be narcotics— into her mouth.  When she arrived at the Mesquite police department, she began dry heaving, and Officer Winters directed her to "spit out the dope!"[1]  But Sanders successfully swallowed the "unknown item believed to be narcotics."[2]

After entering the jail, Sanders's condition deteriorated.  Lieutenant Kelly, the jail supervisor, indicated on the intake form that Sanders suffered from addiction to methamphetamine.  Sanders was moved to a medical cell to be assessed by paramedics.  When the paramedics, Defendants Stone and Palasciano, arrived, Sanders was unresponsive.  Stone and Palasciano did not conduct a physical examination.

Stone and Palasciano questioned Sanders regarding her medical history for approximately five minutes.  They then consulted with Officer Winters, Officer Velasquez, and Lt. Kelly, explaining that it was their choice whether to take Sanders to the hospital for medical treatment or to have her stomach x-rayed.  After the paramedics left, officers took Sanders to booking, where she struggled to stand.  She was monitored by video until officers discovered she was not breathing and lacked a pulse.  Officers called paramedics, but Sanders died before they arrived.

---

[1] Doc. No. 43 at 5.

[2] *Id.*

## II. Claims

Patricia Brannan and Alyssa Sanders, individually and as heirs of Natalie Sanders, bring this suit against the city of Mesquite, Texas, Paramedic Victor Palasciano, Paramedic Kyle Stone, Officer Layton Winters, Officer Peter Velasquez, Lieutenant Michael Kelly, Officer Sherry Green, and Officer Marcelet Martin under 42 U.S.C. § 1983.

## III. 12(b)(6) Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court evaluates the pleadings by "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff."[3]  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[4]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[5]  Although the plausibility standard does not require probability, "it asks for more than a sheer possibility that a defendant has acted unlawfully."[6]  In other words, the standard requires more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."[7]  "A pleading that

---

[3] *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2020).

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[5] *Iqbal*, 556 U.S. at 678.

[6] *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

[7] *Iqbal*, 556 U.S. at 678.

offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'"[8]

## IV. Analysis

The Court considers the claims against Mesquite and the claims against the individual defendants separately.

### A. Mesquite

#### 1. Municipal Liability Legal Standards

Municipal liability under 42 U.S.C. § 1983 arises only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible . . . ."[9] "A plaintiff must identify: '(1) an official policy (or custom) of which (2) a policymaker may be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom.'"[10]

Episodic-act liability typically involves the interposition of an actor, like an employee, between the injured party and the municipal defendant. To prevail on an "act or omission theory," a plaintiff must show "(1) that the municipal employee violated [the pretrial detainee's] clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate

---

[8] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[9] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[10] *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010).

indifference."[11]  "An inadequate training program or a failure to train 'may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom [the municipality] come[s] into contact.'"[12]

### 2. Application

The City of Mesquite moved to dismiss the plaintiffs' complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  To prevail on their municipal-liability claim, the plaintiffs must show that a constitutional violation occurred, the moving force of which was an official policy or custom of which a policymaker had actual or constructive knowledge.[13]  At this phase, the plaintiffs must plead specific facts that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact."[14]  Because the Court finds that the plaintiffs failed to plead facts to state a plausible claim to relief, it **GRANTS** Mesquite's motion to dismiss for failure to state a claim.

As a threshold matter, the Court finds that the plaintiffs failed to plead facts which would allow this Court to infer that Mesquite violated Sanders's Fourth and Eighth Amendment rights.  Sanders was not a post-conviction detainee; therefore, no rights arose under the Eighth Amendment.  And in their response, the plaintiffs

---

[11] *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528–29 (5th Cir. 1999).

[12] *Shepard v. Hansford Cnty.*, 110 F.Supp.3d 696, 716 (N.D. Tex. 2015) (Robinson, J.) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

[13] *Id.*  at 716.

[14] *Twombly*, 550 U.S. at 555.

explain that the Eighth Amendment claims were "typographical errors and not intended to be the basis for a claim."[15]  With respect to the Fourth Amendment claim, the plaintiffs did not allege any facts which would support a claim of unlawful detention or arrest.  Indeed, the plaintiffs argue that Sanders's arrest was due to an outstanding warrant.[16]

With the Eighth and Fourth Amendment claims disposed, only the plaintiffs' assertion that Mesquite violated Sanders's rights under the Fourteenth Amendment remains.  It appears that the plaintiffs intended to allege this violation under episodic-act and failure-to-train theories of municipal liability.

*Episodic Act Liability*.  As explained in the legal standards section above, episodic act liability involves the interposition of an actor, like an employee, between the injured party and the municipal defendant.  To prevail on this theory, the plaintiffs must show "(1) that the municipal employee violated [the pretrial detainee's] clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference."[17]

The Plaintiffs' Fourteenth Amendment claim is a medical-inattention claim.  When officials demonstrate deliberate indifference to a pretrial detainee's serious medical needs, they violate the Fourteenth Amendment.[18]  Deliberate indifference is

---

[15] Doc. No. 49 at 2.

[16] *See* Doc. No. 43 at 4.

[17] *Olabisiomotosho*, 185 F.3d at 528–29.

[18] *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647–48 (5th Cir. 1996).  The deliberate-indifference analysis under the Eighth and Fourteenth Amendments are the same.  Therefore, cases

a demanding standard.[19]  It requires that an official both know the pretrial detainee faces "a substantial risk of serious harm" and disregard "that risk by failing to take reasonable measures to abate it."[20]

Taking the facts in the plaintiffs' pleadings as true, as the Court must, it finds that there is sufficient factual matter to state a plausible claim to relief for violation of Sanders's due process rights under the 14th Amendment.  Officer Winters was aware that Sanders was addicted to methamphetamine because she admitted it to him when he arrested her.  After she swallowed a baggie, she began dry heaving, at which point Officer Winters instructed her to "spit out the dope!"[21]  Officer Winters's arrest report even noted that the item Sanders swallowed was "believed to be narcotics."[22]   These facts indicate that Officer Winters, an employee of the municipality, was aware she had swallowed narcotics.[23]

Although paramedics responded, Sanders was not transported to the hospital. Nor was she physically examined.  The paramedics recommended that the officers monitor her and contact them if Sanders's condition deteriorated.  The paramedics

---

discussing deliberate indifference in the Eighth Amendment context are applicable in this analysis. *See id.* at 647 ("[N]o constitutionally relevant difference exists between the rights of pretrial detainees and convicted prisoners to be secure in their basic needs.  Since the Supreme Court has consistently adhered to a deliberate indifference standard in measuring convicted prisoners' Eighth Amendment rights to medical care and protection from harm, we adopt a deliberate indifference standard in measuring the corresponding set of due process rights of pretrial detainees.").

[19] *See Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (explaining that "[d]eliberate indifference is an extremely high standard to meet").

[20] *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

[21] Doc. No. 43 at 5.

[22] *Id.*

[23] For the sake of brevity, the Court does not discuss the facts with respect to each individual defendant, as it is not necessary for the municipal-liability analysis.

left her care in the hands of the officers, who attempted to book her.  But Sanders couldn't stand.  She "sank to the ground and into a ball."[24]  One of the officers noted that Sanders was "not really responding."[25]  Indeed, Sanders was so unresponsive that "there was no attempt to get her fingerprints or mugshot, which was a standard part of the book-in process."[26]  Despite her rapid deterioration, she was monitored only by remote video until officers discovered she was not breathing.

The specific facts pled by the plaintiffs show a facially plausible claim that at least one official was aware that Sanders faced a substantial risk of serious harm, because it was understood she was a drug addict, had ingested narcotics, and rapidly deteriorated to the point that the standard book-in process could not be completed. The facts also present a facially plausible claim that at least one officer actually drew the inference that Sanders faced a substantial risk of serious harm.  This is so because when the risk of harm is obvious, the Court may conclude that an official drew the inference.[27]  And armed with this knowledge, officials failed to take reasonable action to abate this risk.  Instead, they allowed Sanders to die in a cell without checking on her in person.

Although the plaintiffs have pled sufficient factual matter to allow the Court to infer the existence of a constitutional violation, this is only the first step of the analysis.  The plaintiffs were also required to plead specific facts that would show the

---

[24] Doc. No. 43 at 9.

[25] *Id.*

[26] *Id.* at 20.

[27] *See Farmer*, 511 U.S. at 842 (explaining that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

constitutional violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.  They did not.

The plaintiffs' allegations that Mesquite had a policy of failing to attend to the medical needs of pretrial detainees are conclusory in fashion.  For example, the plaintiffs claim that "the City of Mesquite has an acknowledged custom and widespread practice of refusing to transport detainees to the hospital, despite any condition that is observed."[28]  This unadorned accusation doesn't provide the Court with any specific factual allegations that meet the plausibility standard.

And the claims that a policymaker was aware of the alleged policy or custom are similarly conclusory.  The complaint offers no specific facts to support these claims.  Instead, it argues that "city policymakers have been aware of the customs and practices . . . ."[29]  In order to survive a 12(b)(6) motion to dismiss, the plaintiffs must more specifically plead facts from which the Court may infer that Mesquite is liable for the alleged misconduct.

***Failure to Train Liability.***  Municipal liability may only be imposed under a training theory "where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . ."[30]  The plaintiffs failed to plead any specific facts—as opposed to conclusory allegations—that would support a claim of municipal liability pursuant to a failure-to-train theory.  For example, the plaintiffs claim that "[Mesquite]

---

[28] Doc. No. 43 at 24.

[29] *Id.*  This is but one example of the plaintiffs' conclusory accusations regarding a policymaker's knowledge, all of which are virtually identical.

[30] *Harris*, 489 U.S. at 389.

breached its duty to adequately train officers/deputies/guards/personnel regarding the requirement to provide for the health and safety of detainees/inmates, which failure amounts to deliberate indifference . . . ."[31]  This is tantamount to a recitation of the elements of failure-to-train liability and lacks any specific facts sufficient to state a plausible claim to relief which would overcome the motion to dismiss.

### 3. Conclusion regarding Mesquite

Because the Court finds that the plaintiffs failed to plead facts to state a plausible claim to relief, it **GRANTS** Mesquite's motion to dismiss for failure to state a claim.

### B. Individual Defendants

### 1. Qualified Immunity Legal Standard

Qualified immunity is a two-step analysis.[32]  Typically, the Court first asks "whether an official's conduct violated a statutory or constitutional right of the plaintiff."[33]  If there was a violation, the Court then asks "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."[34]  A right is clearly established when precedent places "the statutory or constitutional question beyond debate."[35]  The conduct of each

---

[31] Doc. No. 43 at 26.

[32] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

[33] *Id.*

[34] *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007).

[35] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

defendant must be assessed individually, even if acting in unison.[36]  The plaintiff bears the burden of proving that the defense of qualified immunity does not apply.[37]

## 2. Analysis

For the same reasons discussed in the municipal liability section, the Court finds that the plaintiffs failed to plead sufficient facts to show a plausible claim to relief for violations of the Fourth and Eighth Amendments.[38]

***Defendant Paramedics***.   The plaintiffs failed to present facts which demonstrate a plausible claim to relief with respect to the defendant paramedics (Palasciano and Stone).  In evaluating a qualified immunity defense, the Court first considers whether Palasciano or Stone violated Sanders's constitutional rights with deliberate indifference.  The Court finds they did not.

The plaintiffs argue that despite Sanders's condition, "[the paramedics] nevertheless made the decision to do 'nothing.'"[39]  But as the Fifth Circuit recently discussed in *Dyer v. Houston*[40], it is well-settled that deciding whether to provide additional medical treatment "'is a classic example of a matter for medical judgment,' which fails to give rise to a deliberate-indifference claim.'"[41]

---

[36] *See Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007) ("[W]e have consistently examined the actions of defendants individually in the qualified immunity context.").

[37] *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012).

[38] As discussed above, the plaintiffs mistakenly pled the Eighth Amendment claims.

[39] Doc. No. 43 at 12.

[40] 964 F.3d 374 (5th Cir. 2020).

[41] *Id*. at 381 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

Because the plaintiffs failed to plead facts sufficient to overcome the Paramedics' qualified immunity defense, the Court **GRANTS** the motion to dismiss with respect to defendants Palasciano and Stone.

***Defendant Officers.***   Overcoming the qualified immunity defense with respect to a medical-inattention claim is fraught with difficulty in the Fifth Circuit. This is because the Circuit's "deliberate-indifference cases are not a paradigm of consistency."[42]   Although many of the Circuit's cases align with the traditional deliberate-indifference standard discussed in *Farmer v. Brennan*, others seemingly require an additional element: that the officer subjectively intend that harm occur.[43] Because some Fifth Circuit cases require plaintiffs to show intent to cause harm in medical-inattention cases and others do not, no clearly established right to be free from medical inattention by officers who do not actually intend to cause harm would exist in the Fifth Circuit.  Or so the reasoning goes.

That dichotomy being recognized, the plaintiffs' medical-inattention claim against the officers is not necessarily doomed.  The panel in *Dyer* noted that "a panel of our court . . . recently wrote that it 'cannot endorse [the subjective intent] analysis' because it 'depart[s] from controlling Supreme Court and Fifth Circuit law.'"[44]  And regardless, this Court must still "analyze whether the Officers' alleged conduct

---

[42] *Id.* at 383.

[43] *See id.*

[44] *Id.* at 380 (quoting *Garza v. City of Donna*, 922 F.3d 626, 636 (5th Cir. 2019)).

contravene[s] clearly established law . . . ."[45]  Clarity may be lacking, but *Dyer* at least clarifies that the plaintiffs' claim at least has a chance.

With that in mind, the Court proceeds to the qualified immunity analysis.  The first step is determining whether the officers violated Sanders's constitutional rights.

***Officer Winters***.  As explained above, a pretrial detainee has a Fourteenth Amendment right "not to have their serious medical needs met with deliberate indifference on the part of confining officials."[46]  To prevail on a deliberate-indifference claim, the plaintiffs must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference.[47]  This is a stringent standard.  "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."[48]

The Court finds that the plaintiffs pled sufficient facts to state a plausible claim that Officer Winters was aware of facts from which the inference could be drawn that Sanders was at a substantial risk of serious harm, *i.e.* a drug overdose. As the arresting officer, Officer Winters observed Sanders from start to finish. During her arrest, she was communicative and ambulatory.  He witnessed her dry-heaving after trying to swallow something and instructed her to "spit out the dope!"[49]

---

[45] *Id*. at 384.

[46] *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001).

[47] *Domino*, 239 F.3d at 755 (quoting *Farmer*, 511 U.S. at 837).

[48] *Thompson*, 245 F.3d at 459.

[49] Doc. No. 43 at 5.

13

He also wrote in his arrest report that the unknown object was "believed to be narcotics."[50]  Given his observation of Sanders, his understanding that she was a methamphetamine user, and his written conclusion that the swallowed object was narcotics, the Court finds that facts existed from which Officer Winters could have inferred Sanders was at substantial risk of serious harm.

Next, the Court must consider whether Officer Winters *actually* drew that inference.  The Supreme Court has explained that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[51]  Here, the risk was obvious.  Given that Officer Winters himself believed that Sanders ingested narcotics, coupled with his observation of her rapid decline, facts exist to state a facially plausible claim that Officer Winters actually drew the inference that a substantial risk of serious harm existed.

Finally, the plaintiffs must plausibly plead facts which plausibly show that Officer Winters disregarded "that risk by failing to take reasonable measures to abate it."[52]  Although Officer Winters observed Sanders's rapid decline, and was aware of the Paramedics' instructions to closely monitor her and notify them if her condition changed, he failed to take reasonable measures to abate the risk of overdose.  Put simply, Officer Winters could have followed the Paramedics' instructions to limit the risk of harm, but he did not.  Instead, he did nothing.  Therefore, the Court finds that

---

[50] *Id*. at 4.

[51] *Farmer*, 511 U.S. at 842.

[52] *Id*. at 847.

the plaintiff's pled enough facts to plausibly allege that Officer Winters disregarded the risk of serious harm.

After demonstrating the plausibility of the existence of a constitutional violation, the plaintiffs must plead facts which plausibly show that Officer Winters's actions were objectively unreasonable in light of clearly established law at the time of the incident.  The relevant inquiry in determining whether a right was clearly established "is . . . whether a reasonable officer could have believed [his or her conduct] to be lawful, in light of clearly established law and the information the . . . officers possessed."[53]  While the plaintiffs need not identify a case directly on point, "existing precedent" must "place[] the statutory or constitutional question beyond debate."[54]

The Fifth Circuit recently found in *Dyer* that *Thompson v. Upshur County*[55] "define[d] clearly established law in sufficient detail to have notified the Officers that their actions were unconstitutional."[56]  Because the facts in this case are similar to those in *Dyer*, the Court finds that *Thompson* also defined clearly established law in sufficient detail to put Officer Winters on notice that his conduct was unconstitutional.

---

[53] *Anderson v. Creighton*, 483 U.S. 635, 636 (1987).

[54] *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)).

[55] 245 F.3d 447.

[56] *Dyer*, 964 F.3d at 384.

he
Case 3:19-cv-01263-X   Document 60   Filed 12/14/20   Page 16 of 23   PageID 475

In *Dyer*, eighteen-year-old Graham Dyer died after "bashing his head over 40 times against the interior of a patrol car while being transported to jail."[57]  Officers were aware that Graham ingested LSD and was incoherent and screaming.[58]  On the way to the jail, the transporting officer pulled over to try to stop Graham from hitting his head against the interior of the patrol car, which he had already done 19 times.[59]  After Officers tasered Graham several times to regain control, the transporting officer drove him to the jail.  Graham hit his head another 27 times before they arrived.[60]  Upon arrival, none of the Officers informed the jail sergeant "that Graham had slammed his head repeatedly against the interior of the patrol car en route to the jail."[61]  Graham was placed in a padded cell, where his breathing became labored.[62]  He was transported to the hospital and died a little less than 24 hours later from blunt force trauma and cranial hemorrhaging.[63]

The Fifth Circuit explained that *Thompson* defined clearly established law in sufficient detail to put the *Dyer* officers on notice. In *Thompson*, a pretrial detainee died in jail as a result of seizure brought on by *delirium tremens*.[64]  The Chief Jailer, upon realizing he was in distress, called paramedics.[65]  EMTs encouraged Thompson,

---

[57] *Id.* at 377.

[58] *Id.*

[59] *Id.* at 378.

[60] *Id.* at 379.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Thompson*, 245 F.3d at 454.

[65] *Id.* at 452.

who was still communicative, to go to the hospital, but Thompson declined, explaining that "if he could consume three beers he would be fine."[66]  Thompson signed a refusal-of-medical-treatment form.[67]  Thompson was transferred to the Upshur County jail, and his condition worsened.[68]  The Sergeant in Upshur County attempted to treat Thompson by dressing his wounds, fitting him in a straitjacket, and placing mattresses in his cell.[69]  But when her shift ended, she instructed her subordinates not to contact paramedics without her permission and not unless Thompson was "going to bleed to death."[70]

Here, as in *Dyer* and *Thompson*, Sanders was suffering from a substance-induced medical emergency.  Officer Winters was aware that Sanders used methamphetamine and believed she had swallowed narcotics.  As in *Dyer* and *Thompson*, paramedics were summoned.  But by that time, unlike Thompson, Sanders was incapable of communicating her treatment preferences.  Aware that she was most likely suffering from a methamphetamine-induced medical emergency, Officer Winters nonetheless failed to do anything to abate the risk of harm.  Arguably, the facts here are more egregious than those in *Thompson*.  In that case, the Jail Sergeant at least attempted to tend to Thompson after he was seen by paramedics.  In contrast, Officer Winters made no attempt to address Sanders's medical crisis, just

---

[66] *Id*. at 453.

[67] *Id*.

[68] *Id*. at 453–54.

[69] *Id*.

[70] *Id*.

17

like the officers in *Dyer* also failed to take any action.  In sum, *Thompson*, which the Fifth Circuit recognized in *Dyer* as being clearly established law, gave Officer Winters "'fair warning' that [his] behavior was deliberately indifferent to [Sanders's] serious medical needs."[71]   Accordingly, the Court **DENIES** the motion to dismiss Officer Winters.

***Lieutenant Kelly***.  The Court similarly finds that the plaintiffs pled sufficient facts to state a plausible claim that Lt. Kelly was aware of facts from which the inference could be drawn that Sanders faced a substantial risk of serious harm.  Lt. Kelly was aware that Sanders had likely swallowed drugs in the sally port because Officer Winters informed him.  On a jail screening form filled out by Lt. Kelly, he marked that Sanders had a drug addition to methamphetamine.  Sanders was able to answer some of the questions in the initial interview Lt. Kelly performed but then rapidly declined.

The plaintiffs also pled facts sufficient to state a plausible claim that Lt. Kelly *actually* drew the conclusion that Sanders was at a substantial risk of serious harm.  Lt. Kelly observed Sanders's decline from her initial interview to her booking, acknowledged she had a drug addiction to meth, and was present when paramedics advised officers to contact them if Sanders's condition changed and to monitor her closely.  Indeed, he was the officer that contacted paramedics in the first place, implying that he recognized the risk of serious harm.

---

[71] *Dyer*, 964 F.3d at 385 (quoting *Morgan*, 659 F.3d at 372).  *Dyer*, of course, was not clearly established law at the time of Sanders's death.  The Court compares the present case with *Dyer* because the facts are similar enough that *Thompson* should have operated as fair notice to Officer Winters, just as the Fifth Circuit ruled it should have operated as fair notice to the defendants in *Dyer*.

Further, while Sanders deteriorated during the book-in process, Lt. Kelly informed her that she had "missed her chance" to receive medical attention.[72]  This statement, coupled with Lt. Kelly's failure to take any kind of remedial action, demonstrates that he was deliberately indifferent to the risk of harm by failing to take any actions to abate it.  Essentially, Lt. Kelly did nothing.

The Court finds that Lt. Kelly's actions were objectively unreasonable in light of clearly established law at the time of Sanders's arrest and death.  As discussed above, *Thompson* defines clearly established law in sufficient detail to give officers fair notice.  Like Officer Winters, Lt. Kelly observed Sanders's condition deteriorate and failed to take action to abate the risk of harm.  He didn't monitor her closely and failed to contact paramedics to notify them of the change in her condition.  The facts with respect to Lt. Kelly are similar to those in *Thompson*. After initial medical examination, Sanders was left at the jail.  But unlike the jail sergeant in *Thompson*, Lt. Kelly did nothing to assist Sanders.  He didn't check on her in her cell or dress her wounds; instead, he told her that her chance to receive medical assistance had passed.  Ignoring the paramedics' instructions, Lt. Kelly left Sanders in a cell to die as a result of a drug overdose.

So, as with Officer Winters, *Thompson* (which the Fifth Circuit recognized in *Dyer* as being clearly established law) gave Lt. Kelly "'fair warning' that [his] behavior was deliberately indifferent to [Sanders's] serious medical needs."[73]

---

[72] Doc. No. 43 at 18.

[73] *Dyer*, 964 F.3d at 385 (quoting *Morgan*, 659 F.3d at 372).

*Officers Velasquez, Green, and Martin.*

The Court finds that the plaintiffs failed to plead sufficient facts to state a plausible claim that Officer Velasquez, Officer Green, or Officer Martin committed a constitutional violation. As explained above, to show a constitutional violation on a medical-inattention theory, the plaintiffs must demonstrate that the defendants were aware of facts that would enable them to infer that a substantial risk of serious harm existed; they must have actually drawn that inference; and they must have disregarded the risk by failing to take reasonable measures to abate it.

The allegations against these three officers—which the plaintiffs pled collectively[74]—are sparse. The plaintiffs claim that all three officers were involved in the booking process. Officer Velasquez was in charge of property inventory; Officer Green asked Sanders if she was going to "throw up," and noted that she was "cold and shaking," and Officer Martin, along with the other officers, "assisted with searching [Sanders] and removing her jewelry."[75] Officer Green assisted Officer Winters in the sally port after learning Sanders had swallowed an unknown object.

It may be true that even a layperson would be aware of facts that would enable them to draw the inference that Sanders was experiencing a medical emergency. She was unable to speak, stand, or walk. But the plaintiffs were also required to plead facts indicating that the officers *actually* drew the inference that a substantial risk of serious harm existed. They did not. The threadbare allegations do not include facts

---

[74] *See Meadours*, 483 F.3d at 421–22 ("[W]e have consistently examined the actions of defendants individually in the qualified immunity context.").

[75] Doc. No. 49 at 18.

which would tend to show that Officers Velasquez, Green, or Martin actually drew the inference that Sanders was at a substantial risk of serious harm.

Unlike the plaintiffs' allegations concerning Officer Winters or Lt. Kelly, the allegations concerning Officers Velasquez, Green, and Martin do not include any facts showing that: (1) they were aware Sanders had ingested drugs;[76] (2) they were present during her medical evaluation;[77] or (3) they were aware that paramedics recommended close monitoring. So, while Sanders's physical state could have allowed the Officers to infer she was at substantial risk of serious harm, the plaintiffs failed to present facts which plausibly show that these officers *actually* drew that inference. Accordingly, the Court finds that Officer Velasquez, Officer Green, and Officer Martin are entitled to qualified immunity. The Court **GRANTS the** motion to dismiss with respect to Officers Velasquez, Green, and Martin.

## V. Conclusion

The Court **GRANTS** Mesquite's motion to dismiss and **GRANTS** the individual defendants' motion to dismiss with respect to Paramedic Palasciano, Paramedic Stone, Officer Velasquez, Officer Green, and Officer Martin on the basis of qualified immunity. The plaintiffs' claims against the foregoing defendants are

---

[76] Officer Green was present at the sally port and knew Sanders had swallowed something, but the plaintiffs failed to plead sufficient facts to plausibly demonstrate that Officer Green understood that that unknown item was narcotics. Although Officer Winters made that conclusion in his arrest report, assumedly that conclusion was not yet available at this point. The plaintiffs did not plead facts plausibly stating that Officer Green had actual knowledge that Sanders ingested drugs, even if she may have suspected as much.

[77] Officer Velasquez was present when paramedics said they would leave the decision to take Sanders to the hospital up to the jail, but the plaintiffs failed to plead sufficient facts to plausibly demonstrate that Officer Velasquez had knowledge that Sanders had ingested drugs or observed her during the medical evaluation. Thus, the plaintiffs failed to state a facially plausible claim that Officer Velasquez actually drew the inference that Sanders was at a substantial risk of serious harm.

**DISMISSED WITHOUT PREJUDICE**.   With respect to Officer Winters and Lieutenant Kelly, the Court **DENIES** the motion to dismiss.

The Court grants the plaintiffs one opportunity to amend their claims against Mesquite, Paramedic Victor Palasciano, Paramedic Kyle Stone, Officer Velasquez, Officer Green, and Officer Martin.  Although the plaintiffs did not request to amend any potential deficiencies, the Court will allow leave for them to replead in this case.[78] Because there is no indication that the plaintiffs are unwilling or unable to cure the pleading defects the court has identified, the Court finds that the plaintiffs should be allowed one opportunity to amend their complaint.

If the plaintiffs decide to amend, they must also file a Rule 7(a) reply to address the assertions of qualified immunity by Paramedic Palasciano, Paramedic Stone, Officer Velasquez, Officer Green, and Officer Martin at the appropriate time.  The reply shall define clearly established law that the defendants are alleged to have violated and cite to reported cases of the Fifth Circuit or the Supreme Court of the United States to support their allegations.  The plaintiffs should allege facts which, if true, would show that the defendants were deliberately indifferent to Sanders's serious medical need and which, if true, would overcome the defendants' assertions of qualified immunity.

---

[78] *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (explaining that district courts "often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal").

**IT IS SO ORDERED** this 14th day of December 2020.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE