UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PATRICIA BRANNAN and ALYSSA SANDERS, individually and as heirs of NATALIE SANDERS, <br><br> *Plaintiffs,* <br><br> v. <br><br> CITY OF MESQUITE, TEXAS, et al., <br><br> *Defendants.* | § § § § § § § § § § § § § Civil Action No. 3:19-CV-01263-X |

**MEMORANDUM OPINION AND ORDER**

This case arises from the death of Natalie Sanders, who died as a result of a methamphetamine overdose while in custody at the Mesquite jail. The Court previously denied a motion to dismiss for a failure to state a claim on qualified immunity grounds as to Officer Layton Winters and Lieutenant Michael Kelly. The Court also and granted the motion to dismiss on qualified immunity grounds as to Paramedic Victor Palasciano, Paramedic Kyle Stone, Officer Peter Velasquez, Officer Sherry Green, and Officer Marcelet Martin. [Doc. No. 60]. And the Court granted Mesquite's motion to dismiss. However, in dismissing the claims against these parties, the Court gave the plaintiffs an opportunity to amend their complaint as to these parties.

The plaintiffs did so, and the defendant officers and paramedics moved to dismiss the amended complaint for failure to state a claim, again asserting qualified immunity. [Doc. No. 69]. The City of Mesquite separately moved to dismiss for

1

failure to state a claim. [Doc. No. 68]. Although the plaintiffs repeated their allegations against Mesquite in their amended complaint, they later explained that they were not repleading against Mesquite. [Doc. No. 65]. After careful consideration, and as explained below, the Court **GRANTS** Mesquite's motion to dismiss and **GRANTS** the individual defendants' motion to dismiss as to the Paramedics Victor Palasciano and Kyle Stone. The Court **DENIES** the individual defendants' motion to dismiss with respect to Officer Sherry Green, Officer Marcelet Martin, and Officer Peter Velasquez.

## I. Background

In 2017, Officer Jeremie Wood and Officer Winters arrested Natalie Sanders on an outstanding warrant. Sanders surrendered a methamphetamine pipe to the officers. After being placed in the patrol car, Sanders put an object—believed to be narcotics—into her mouth. When she arrived at the Mesquite police department, Sanders began to spit into a trash can and make dry heaving movements. Officers repeatedly urged Sanders to open her mouth, and, after they had observed her swallow, to tell them what she had swallowed. Sanders refused to say what she had swallowed.

After entering the jail, Sanders's condition deteriorated. Sanders told Lieutenant Kelly, the jail supervisor, that she was addicted to meth. Sanders was moved to a medical cell to be assessed by paramedics. When the paramedics, Defendants Stone and Palasciano, arrived, Sanders was curled into a ball and not

2

fully responsive. Stone and Palasciano checked Sanders's vitals, but apparently conducted no further physical examination.

Stone and Palasciano questioned Sanders for approximately five minutes. They then consulted with some of the officers, explaining that it was the officers' choice whether to take Sanders to the hospital to have her stomach x-rayed and receive any further medical treatment. Because Lieutenant Kelly declined to have Sanders transported to the hospital, the paramedics told the officers to monitor Sanders closely and to call them immediately if her condition worsened.

After the paramedics left, officers took Sanders to booking, where she struggled to stand. Because of her poor state, the officers could not complete the booking process. Despite Sanders's obvious decline, they did not follow the paramedics' instructions to call them back.[1] Rather, she was brought to a cell where she was monitored by video until officers discovered she was not breathing and lacked a pulse. At that point the officers called the paramedics, but Sanders died before they arrived.

Patricia Brannan and Alyssa Sanders, individually and as heirs of Natalie Sanders, bring this suit against the city of Mesquite, Paramedic Victor Palasciano, Paramedic Kyle Stone, Officer Layton Winters, Officer Peter Velasquez, Lieutenant Michael Kelly, Officer Sherry Green, and Officer Marcelet Martin under 42 U.S.C. § 1983.

---

[1] The complaint alleges that, after the paramedics left, Sanders became "unable to walk, stand, communicate, interact, or respond." Doc. No. 64 at 18.

## II. Rule 12(b)(6) Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), the Court evaluates the pleadings by "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs."[2] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[3] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[4] Although the plausibility standard does not require probability, "it asks for more than a sheer possibility that a defendant has acted unlawfully."[5] In other words, the standard requires more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."[6] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"[7]

## III. Analysis

As a threshold matter, the defendants argue that the statute of limitations bars the plaintiffs' claims at this point because their latest amended complaint was filed after the statute of limitations had passed. But because the amended complaint

---

[2] *Hutcheson v. Dall. Cnty.*, 994 F.3d 477, 481–82 (5th Cir. 2021).

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[4] *Iqbal*, 556 U.S. at 678.

[5] *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

[6] *Iqbal*, 556 U.S. at 678.

[7] *Id.* (quoting *Twombly*, 550 U.S. at 555).

4

"relates back" to the timely filed original complaint, the statute of limitations does not bar the plaintiffs' claims. Although both parties fail to cite it, Federal Rule of Civil Procedure 15(c) "governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations."[8] It states that the amendment to a complaint "relates back" to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . ."[9] Because the plaintiffs' amended complaint does exactly that, it "relates back" to the timely filed original pleading, and there is no statute of limitations issue.

Having disposed of this statute of limitations argument, the Court now turns to the plaintiffs' claims. The Court considers the claims against Mesquite and the claims against the individual defendants separately.

### A. Mesquite

As discussed above, the Court dismissed the claims against the City of Mesquite in the plaintiffs' previous complaint. The current complaint contains no new allegations against Mesquite, and the plaintiffs have clarified that they are not

---

[8] *Krupski v. Costa Crocier S. p. A.*, 560 U.S. 538, 541 (2010).
[9] FED. R. CIV. P. 15(c)(1)(B).

5

repleading their claims against Mesquite. Accordingly, the Court **GRANTS** Mesquite's motion to dismiss for failure to state a claim.

## B. Individual Defendants

As a threshold matter, the Court considers the plaintiffs' Fourth and Eighth Amendment claims. Without any new relevant allegations, the plaintiffs have repleaded their claims that the individual defendants violated Sanders's Fourth and Eighth Amendment rights despite the Court's prior dismissal of these claims. The plaintiffs have alleged no facts which would support a claim of unlawful detention or arrest, nor have they alleged that Sanders was a post-conviction detainee. Accordingly, the Court finds that the plaintiffs failed to plead facts which would allow the Court to conclude that the individual defendants violated Sanders's Fourth and Eighth Amendment rights. Having disposed of these claims, the Court now turns to the plaintiffs' Fourteenth Amendment claims and the corresponding qualified immunity analysis.

### 1. Qualified Immunity Legal Standard

Qualified immunity is a two-step analysis.[10] Typically, the Court first asks whether "the official violated a statutory or constitutional right . . . ."[11] If there was a violation, the Court then asks "whether qualified immunity is still appropriate because the defendant's actions were objectively reasonable in light of law which was clearly established at the time of the disputed action."[12] A right is clearly established

---

[10] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

[11] *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).

[12] *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007).

6

when precedent places "the statutory or constitutional question beyond debate."[13] The conduct of each defendant must be assessed individually, even if they acted in unison.[14] Once a defendant has asserted the defense of qualified immunity, the plaintiff bears the burden of proving that it does not apply.[15]

A pretrial detainee has a Fourteenth Amendment right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials."[16] To prevail on a deliberate-indifference claim, the plaintiffs must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) that the official actually drew that inference.[17] Finally, the plaintiffs must show that the officer ignored "that risk by failing to take reasonable measures to abate it."[18]

As the Court previously explained, this is a stringent standard.[19] "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."[20] "Rather, the plaintiff must show

---

[13] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[14] *See Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007) ("[W]e have consistently examined the actions of defendants individually in the qualified immunity context.").

[15] *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012).

[16] *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001).

[17] *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 755 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendants continue to argue that, because some Fifth Circuit cases require plaintiffs to also show that the officers intended to cause harm in deliberate indifference cases, the deliberate indifference standard is not clearly established for qualified immunity purposes. However, as the Court explained in its prior opinion, the Fifth Circuit rejected this exact argument in *Dyer v. Hous.,* 964 F.3d 374 (5th Cir. 2020).

[18] *Farmer*, 511 U.S. at 847.

[19] *See Domino*, 239 F.3d at 756.

[20] *Thompson*, 245 F.3d at 459.

7

that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[21]

## 2. Analysis

***Defendant Paramedics.*** Notwithstanding their contention to the contrary, the plaintiffs do not appear to have actually added any new allegations against the Paramedics Palasciano and Stone in their Third Amended Complaint.[22] Accordingly, for the same reasons stated in its previous Memorandum Opinion and Order,[23] the Court **GRANTS** the motion to dismiss with respect to defendants Palasciano and Stone.

***Officer Green.*** As explained above, a pretrial detainee has a Fourteenth Amendment right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials."[24] The Court finds that the plaintiffs

---

[21] *Domino*, 239 F.3d at 756 (cleaned up).

[22] Plaintiffs claim that they added allegations that the paramedics were aware that protocol required them to obtain Sanders's signature to decline treatment and that the paramedics forged Sanders's signature. Doc. No. 73 at 4. However, the plaintiffs included these same forgery allegations in the previous complaint the Court already considered and rejected. Doc. No. 43 at 13–14.

[23] Doc. No. 60 at 11–12. While the Court is troubled by the allegation that the defendants deviated from protocol and forged Sanders's signature, this protocol does not define the parameters of adequate medical care under the Fourteenth Amendment. Accordingly, non-compliance with this protocol—even by fraudulent means—does not on its own constitute deliberate indifference to Sanders's serious medical needs.

The decision by the paramedics to instruct the officers to monitor Sanders closely and to call them immediately if her condition worsened did not approach the "wanton disregard for . . . serious medical needs" necessary to support a claim of deliberate indifference. *Domino*, 239 F.3d at 756. After all, implicit in the plaintiffs' claims against the police officers is that (1) the officers were fully capable of following the paramedics' instructions and (2) had they done so when Sanders's decline was obvious, things would have turned out differently. As such, the paramedics' decision was "a classic example of a matter for medical judgment, which fails to give rise to a deliberate-indifference claim." *Dyer* , 964 F.3d at 381.).

[24] *Thompson*, 245 F.3d at 457.

8

plead sufficient facts to state a plausible claim that Officer Green acted with deliberate indifference to Sanders's serious medical needs. First, the Court considers whether Officer Green was aware of facts from which the inference could be drawn that there was a substantial risk of serious harm to Sanders. Before Officer Green was sent to the sally port to help Officer Winters with Sanders, Officer Martin told her that Officer Winters believed that Sanders had swallowed drugs. In the sallyport, Officer Green tried to pry Sanders's mouth open and repeatedly told Sanders to "open her mouth." After Officer Green saw Sanders swallow before she finally opened her mouth, Officer Green advised Sanders that, whatever illegal substance she had swallowed, she would not face charges for it if she told them what it was.

After Lieutenant Kelly briefly met with Sanders and filled out a jail screening form indicating that Sanders was addicted to methamphetamine, Officer Green took Sanders to the holding cell. There, Officer Green removed some of Sanders's personal items. Officer Green was still in the cell when the paramedics entered and asked Sanders "what did you swallow?" As the paramedics departed, Officer Green was in the group of officers that the paramedics told to monitor Sanders and to call them if her condition deteriorated.

After the paramedics left, Officers Green, Martin, Velasquez, and Kelly attempted to continue with the book in process by removing Sanders's jewelry. However, at this point, Sanders was unable to stand. She fell to the floor and curled into a ball with her forehead touching the ground, and the officers had to pull her up and hold her to continue removing her jewelry. She was moaning and her breathing

was labored. Officer Martin asked Sanders if she was going to throw up. Officer Green noted that Sanders was "cold and shaking" and told Sanders to warn them if she was in fact going to throw up. One of the officers commented that Sanders was "not really responding." Because Sanders was so ill, the officers were unable to continue the booking process, which would have required them to obtain her fingerprints and mugshot and to have her sign paperwork. Instead, Officer Green and Officer Martin took Sanders—each holding one of Sanders's arms—to the cell where she would soon die.

These facts are sufficient to state a plausible claim that Officer Green was aware of facts from which the inference could be drawn that Sanders faced a substantial risk of serious harm. Next, the Court must consider whether Officer Green actually drew that inference. "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[25] Here the risk of serious harm from a drug overdose was obvious, and it is clear that Officer Green was aware of that risk.

From the beginning, Officer Green was told that Sanders was believed to have swallowed drugs. Officer Green continually tried to get Sanders to open her mouth or to tell Officer Green what Sanders had swallowed. Officer Green even advised Sanders that she would not face charges if she told Officer Green what she had swallowed, indicating that Officer Green believed that Sanders had swallowed an illegal substance. Green was in the group of officers told by the paramedics to monitor

---

[25] *Farmer*, 511 U.S. at 842.

10

Sanders and to contact them if her condition worsened. Despite observing Sanders's deteriorating condition, Officer Green did not contact the paramedics as instructed or do anything at all to abate that risk.[26] Accordingly, the plaintiffs have pleaded sufficient facts to plausibly allege that Officer Green acted with deliberate indifference to Sanders's serious medical needs, satisfying the first prong of the qualified immunity analysis.

As the Court explained previously,[27] after demonstrating the plausibility of the existence of a constitutional violation, the plaintiffs must plead facts which plausibly show that Officer Green's actions were objectively unreasonable in light of clearly established law at the time of the incident. The relevant inquiry in determining whether a right was clearly established "is . . . whether a reasonable officer could have believed [his or her conduct] to be lawful, in light of clearly established law and the information the . . . officers possessed."[28] While the plaintiffs need not identify a case directly on point, "existing precedent" must "place[] the statutory or constitutional question beyond debate."[29]

In its previous memorandum opinion and order, the Court explained that the Fifth Circuit's opinion in *Dyer v. Houston*[30] found that a prior Fifth Circuit opinion,

---

[26] *Id.* at 847.

[27] Doc. No. 60.

[28] *Keller v. Fleming*, 952 F.3d 216, 225 (5th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

[29] *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft*, 563 U.S. at 741).

[30] 964 F.3d 374 at 384.

*Thompson v. Upshur County*,[31] had put the *Dyer* officers on notice that their actions were unconstitutional. And the Court held that Officer Winters and Lieutenant Kelly's conduct was similar enough to the *Dyer* officers' conduct that *Thompson* had also sufficiently defined clearly established law to put Officer Winters and Lieutenant Kelly on notice that their conduct was unconstitutional.[32] For the same reasons, the Court now finds that *Thompson* also put Officer Green on notice that her conduct was unconstitutional.

*Dyer* arose out of the death of Graham Dyer after he "bash[ed] his head over 40 times against the interior of a patrol car while being transported to jail."[33] Dyer had swallowed LSD, and he was incoherent and screaming.[34] Upon arrival at the jail, however, the officers did not inform the jail sergeant that Dyer had repeatedly hit his head against the interior of the car.[35] Graham was only transported to the hospital two hours later when his breathing became labored, and he died soon thereafter from blunt force trauma and cranial hemorrhaging.[36]

In *Dyer*, the Fifth Circuit explained that *Thompson* put the officers on notice that their conduct was unconstitutional.[37] *Thompson* arose out of Michael Thompson's death from wounds sustained in a seizure brought on by *delirium*

---

[31] 245 F.3d 447 (5th Cir. 2001).

[32] Doc. No. 60 at 15–19.

[33] *Dyer*, 964 F.3d at 377.

[34] *Id.* at 379.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 384–86.

*tremens*.[38] Paramedics, who had been summoned by the jailer, encouraged the conscious Thompson to go to the hospital. Instead, Thompson insisted he would be fine "if he could consume three beers" and signed a refusal-of-medical-treatment form.[39] Transferred to another jail, Thompson's condition worsened.[40] The officer in charge of the jail attempted to treat Thompson by dressing his wounds, fitting him in a straitjacket, and placing mattresses in his cell to protect him from further harm. But when her shift ended, the officer told her subordinates not to contact paramedics without her permission and not unless Thompson was "going to bleed to death."[41] The Fifth Circuit found the officer had acted with deliberate indifference to Thompson's serious medical needs.[42]

Here, as in *Dyer* and *Thompson*, Sanders was suffering from a substance-induced medical emergency. Officer Green was aware that Sanders was believed to have swallowed narcotics from the moment she was sent to the sally port to assist with her, and repeatedly urged Sanders to open her mouth and disclose what she had swallowed. Paramedics were summoned, and Officer Green was among the group they told to monitor Sanders closely and call them back immediately if her condition worsened. Despite observing Sanders's deterioration during the aborted booking process, Officer Green did not call the paramedics back. Rather, Officer Green, along

---

[38] *Thompson*, 245 F.3d at 454.

[39] *Id.* at 453.

[40] *Id.*

[41] *Id.* at 454.

[42] *Id.* at 464.

13

with Officer Martin, simply left Sanders in the cell where she died. As the Court previously noted,[43] the allegations here are arguably worse than in *Thompson*, where the officer at least attempted to treat the detainee and protect him from further harm after he was seen by paramedics.[44] Like the officers in *Dyer*, however, Officer Green took no action at all to protect Sanders. In sum, *Thompson*, which the Fifth Circuit recognized in *Dyer* as being clearly established law, gave Officer Green "fair warning that [her] behavior was deliberately indifferent to [Sanders's] serious medical needs."[45] Accordingly, the Court **DENIES** the motion to dismiss Officer Green.

*Officer Martin.* The Court finds that the plaintiffs plead sufficient facts to state a plausible claim that Officer Martin acted with deliberate indifference to Sanders's serious medical needs. Officer Winters told Officer Martin via radio that he believed that Sanders had swallowed drugs. Officer Martin conveyed this information to Officer Green. Officer Martin was summoned to assist with Sanders's booking, by which point Sanders was unable to stand and the officers had to hold her up to remove her jewelry. At this point, Officer Martin asked Sanders if she was going to throw up. Unable to complete the booking process due to Sanders's state, Officer Martin and Officer Green helped Sanders to a cell. Officer Martin was told to monitor Sanders, and she did so by camera. Apparently because Lieutenant Kelly

---

[43] Doc. No. 60 at 17.

[44] *Thompson*, 245 F.3d at 453–54.

[45] *Dyer*, 964 F.3d at 385 (cleaned up). As the Court explained in its previous opinion, *Dyer* was not clearly established law at the time of Sanders's death. The Court compares the present case with *Dyer* because the facts are similar enough that *Thompson* should have operated as fair notice to Officer Green, just as the Fifth Circuit ruled it operated as fair notice to the officers in *Dyer*.

14

had not ordered a "close watch," Officer Martin did not physically check on Sanders. Despite her awareness of a serious risk of harm to Sanders, Officer Martin did not take reasonable actions to abate that risk. Eventually, evidently believing that Sanders was having a seizure, Officer Martin asked another officer to physically check on Sanders, and the officer found that Sanders was not breathing and had no pulse. The officers then called paramedics, but it was too late.

Just as it did with respect to Officer Green, *Thompson* defined clearly established law in sufficient detail to give Officer Martin fair notice that her conduct was unconstitutional. Like Officer Green, Officer Martin was aware that Sanders was believed to have swallowed narcotics from the very start. She observed Sanders's deteriorating condition during the aborted booking process and escorted Sanders to her cell. Charged with monitoring Sanders, Officer Martin never physically checked on Sanders despite her awareness of Sanders's poor state. Officer Martin did not take any action at all to abate the obvious risk of harm to Sanders until Sanders appeared to be having a seizure. But this was too little, too late. As with Officer Green, *Thompson* gave Officer Martin notice that her conduct was unconstitutional. Accordingly, the Court **DENIES** the motion to dismiss with respect to Officer Martin.

***Officer Velasquez.*** The Court finds that the plaintiffs have plead sufficient facts to state a plausible claim that Officer Velasquez acted with deliberate indifference. While the plaintiffs do not state at exactly what point Officer Velasquez was made aware that Sanders was believed to have swallowed drugs, Officer Velasquez was in the group of officers that observed the paramedics' interaction with

15

Sanders. Officer Velasquez was one of the officers the paramedics told that it would be "prudent" to take Sanders to the hospital to have her stomach x-rayed and that they should closely monitor Sanders and call them back immediately if her condition worsened. As the officer in charge of property inventory for bookings, Officer Velasquez was also in the group that helped remove Sanders's jewelry as part of the aborted booking process. As described above, Sanders's distress at this point was obvious. She could not stand up, her breathing was labored and she was moaning, and she was "cold and shaking." Two of the officers asked Sanders whether she was going to throw up, and another commented that Sanders was "not really responding." Despite observing Sanders's declining condition, Officer Velasquez did not follow the paramedics' instructions to call them back immediately. Although he was aware of a serious risk of harm to Sanders, Officer Velasquez took no action whatsoever to abate that risk. Just as *Thompson* put Officers Green and Martin on notice that their conducted violated the Constitution, it put Officer Velasquez on notice that his conduct violated the Constitution as well. Accordingly, the Court **DENIES** the motion to dismiss with respect to Officer Velasquez.

## IV. Conclusion

The Court **GRANTS** Mesquite's motion to dismiss and **GRANTS** the individual defendants' motion to dismiss with respect to Paramedics Palasciano and Stone. The plaintiffs' claims against the foregoing defendants are **DISMISSED WITH PREJUDICE**. With respect to Officers Green, Martin, and Velasquez the Court **GRANTS** the motion to dismiss the claims against them arising under the

16

Fourth and Eighth Amendments. These claims are **DISMISSED WITH PREJUDICE**. However, the Court **DENIES** the motion to dismiss the claims against Officers Green, Martin, and Velasquez arising under the Fourteenth Amendment.

    **IT IS SO ORDERED** this 5th day of November, 2021.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE